HANRICK (SEVENTH WARD BANK v.). See Case No. 12,678.

---

## Case No. 6,036.
### The HANSA.
### [2 Ben. 299.] [1]

District Court. S. D. New York. March, 1868.[2]

COLLISION IN NEW YORK HARBOR—STEAM VESSELS CROSSING—LOOKOUT.

1. Where a steamer was coming into New York harbor from the sea. in the daytime, having on her starboard hand a steam vessel, built for a floating grain elevator, which was crossing her path. and the latter kept her course. but was struck by the steamer. and the steamer claimed that there were vessels at anchor which prevented her from going under the stern of the elevator, the steamer's lookout having seen the latter, but not having reported her for the reason that, as he supposed, the captain and pilot, who were on the bridge, saw her: *Held*, that, as the vessels were crossing, it was the duty of the steamer, having the elevator on the starboard side, to keep out of the way. The failure of the lookout to report the elevator, when he saw her, was negligence.

2. As the steamer did not pretend that she was baffled or misled by any movement on the part of the other vessel, and her only mode of keeping out of the way of the latter was to go under her stern. she must prove that, at no time after she was first near enough to have discovered the latter. could she have ported, and thus avoided the collision.

3. It was not proved that the steamer entered among the crowd of vessels before she ought to have discovered the elevator.

---

1 [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
2 [Affirmed in Case No. 6,038.]

In admiralty.

W. J. Haskett, for libellant.
W. Q. Morton, for claimants.

SHIPMAN, District Judge. This is a suit to recover damages for a collision between the steamer Hansa and the elevator Transporter, owned by Stephen K. Lane the libellant. The former is a large sea-going steamer, running between New York and Bremen, and the latter is a small steam vessel, having a tower or elevator on deck, and used about the harbor of New York for the purpose of transferring grain in bulk. The collision occurred between five and six o'clock, in the afternoon of the 13th of March, 1865, in the Hudson river, opposite New York City, and near the New Jersey shore.

The Hansa was just in from sea, and bound to her dock at Hoboken. The Transporter was crossing the river from New York to the coal docks at Jersey City. The Hansa was in charge of a pilot, and had a lookout stationed on her forecastle. This lookout says he first saw the Transporter three or four points on the starboard bow of the Hansa, crossing the river, and that this might have been eight or ten minutes before collision. He states that he did not report her, because he supposed the captain and pilot of the Hansa, who were on the bridge at the time, saw her. He also says that the Hansa blew her whistle to the Transporter, but whether before or after he first saw her, he cannot say. Both he and Harrow, the pilot of the Hansa, say that the Transporter did not change her course till at or about the time of the collision. The captain of the Hansa fixes the distance apart of the vessels, when he first saw the Transporter, at a half a mile, and says that the pilot saw her at the same time. The pilot thinks she might have been three, four, or five lengths of the Hansa off when he first discovered her. The captain of the Hansa says that he feared a collision when he saw the Transporter, and commenced blowing his whistle. Newman, the third officer of the Hansa, says that when he first heard the whistle blow, the Transporter was about a length and a half (of Hansa) on her starboard bow, ahead of her, and coming at right angles. From the whole evidence presented on the part of the Hansa, she must have been moving at a speed of six or seven knots just before the collision. The Transporter was bound from pier 1, on the New York side, to the coal docks at Jersey City, and was moving at not more than half the speed of the Hansa. As the tide was ebb she headed, as she neared the west shore, a little up the river. It was broad daylight, and there can be no doubt that the Hansa could have discovered the Transporter early enough to have taken decisive measures to clear her, unless she was in some way embarrassed in her movements. The vessels were crossing under circumstances which bring them directly within the rule laid down in the fourteenth article of the statute for preventing collisions, which provides that "if two ships, under steam, are crossing each other, so as to involve risk of collision, the ship which has the other on her starboard side shall keep out of the way of the other." The Hansa had the Transporter on her starboard side, from a point a long distance below where the collision took place, and at which it was clearly her duty to have discovered her, whether she did in fact or not, and to have gone to starboard of her, unless prevented by circumstances over which she had no control. This was her duty, imperatively fixed by statute. The burden of proof is on her to show that she was prevented from conforming to the rule by circumstances beyond her control. The only important excuse which she offers is, that the river was full of vessels at anchor, which rendered her navigation difficult. On this point the evidence is conflicting as to the number and location of the anchored vessels in that section of the river passed over by the Hansa, between the time she actually discovered the Transporter and the moment of collision. The witnesses for the libellants testify that the great bulk of the anchored fleet lay along within three hundred yards of the Jersey shore, while the river to the eastward was comparatively clear. The witnesses for the Hansa, who testify on this point, insist that the anchored vessels extended across the river to Castle Garden. Captain Von Santen says he could not have ported his helm (as he would have had to do to have gone to starboard, and astern of the Transporter), because he should have run foul of other vessels, and that vessels were at anchor clear across the river to Castle Garden. This may be true after he entered the anchored fleet, though I am inclined to the opinion, upon the whole evidence, that the vessels at anchor were much more numerous near the Jersey shore, along the route which the Hansa took, than in the middle of the river and to eastward. But the difficulty in this part of the defence is, that the proof fails to show that the Hansa entered among this dense fleet, before she reached the point where she might and ought to have discovered the Transporter. She is seeking to exonerate herself from the charge of having violated a fixed and well-known rule of navigation. She does not pretend that she was baffled or misled by varying movements of the Transporter. Her witnesses say that the latter held her course. The Hansa was bound, therefore, to keep out of the way of the Transporter, and her only mode of doing so was to have gone to starboard, and astern of her. To effectually excuse her for not doing so, she must show that at no time after she was first near enough to have discovered the Transporter could she have ported, and thus have avoided all chance of collision. As already remarked on this point, the proof is unsatisfactory, and her defence

fails. The lookout on the Hansa failed to do his duty. He did not report the Transporter when he discovered her, on the ground, as he alleges, that he supposed the captain and pilot then saw her. This, of itself, was great negligence on his part. Nothing, under such circumstances, should be left to conjecture. He should have reported the steamer at once, and it is possible that his failure to do so may have prevented the Hansa from changing her course, as she otherwise would, or, at least, might have done.

Let a decree be entered for the libellants, with an order of reference to compute the damages.

[On appeal to the circuit court this decree was in all respects affirmed in an opinion by Woodruff, Circuit Judge. Case No. 6,038.]